NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 24-636

STATE OF LOUISIANA

VERSUS

KE'UNDRA MEKEL WALKER

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 352,764
HONORABLE WILLIAM GREGORY BEARD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**CANDYCE G. PERRET**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Candyce G. Perret, and Gary J. Ortego, Judges.

**AFFIRMED.**

**Edward K. Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT-APPELLANT:**
     **Ke'Undra Mekel Walker**

**Hon. Phillip Terrell, Jr.**
**9th Judicial District Court, District Attorney**
**Kenneth A. Doggett, Jr.**
**Assistant District Attorney**
**P. O. Box 7358**
**Alexandria, LA 71306-7358**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**PERRET, Judge.**

On October 12, 2021, Defendant, Ke'Undra Mekel Walker, was charged by grand jury indictment with one count of second degree murder, in violation of La.R.S. 14:30.1.  After a two-day jury trial, Defendant was found guilty as charged. On February 1, 2024, the trial court denied Defendant's Motion for Post Verdict Judgment of Acquittal and Motion for New Trial.  The same day, after waiving sentencing delays, Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence.

Defendant now appeals her conviction, asserting that the evidence presented at trial was insufficient to convict her of second degree murder beyond a reasonable doubt. For the reasons discussed below, we affirm Defendant's conviction and sentence.

**FACTS AND PROCEDURAL BACKGROUND:**

On June 4, 2021, a zydeco event was held at the VFW in Alexandria, Louisiana.  Both Defendant and the victim, Mikelia Busch, attended the event with their respective friends.  The two did not know each other.  At some point in the early morning hours of June 5, 2021, a fight broke out in the Family Dollar parking lot, which was adjacent to the VFW.  During that fight, a gun was discharged, and the bullet struck the victim in the head.  She ultimately died from her wounds.  The law enforcement investigation led officers to look for Defendant, who turned herself in to the Alexandria Police Department.  Defendant admitted to having a gun at the event and to pulling it from her waistband during the fight but maintained during her trial testimony that the gun accidentally discharged.  Because Defendant challenges the sufficiency of the evidence against her, we will discuss all relevant evidence adduced at trial.

Doctor Christopher Tape, an expert in the field of forensic pathology, testified that he performed an autopsy on the victim. Dr. Tape determined Mikelia's cause of death to be a gunshot wound to the head and her manner of death to be a homicide. According to Dr. Tape, the bullet entered Mikelia's skull on the right side, traveled through her brain, and impacted her skull on the left side but did not exit. Dr. Tape explained that due to the type of injury she sustained, Mikelia would have remained alive for "ten minutes, plus or minus" and that she would have been unconscious "right away." During his examination of Mikelia's body, Dr. Tape found a blunt force injury to her left hand. Dr. Tape noted that Mikelia's toxicology report revealed that her blood alcohol concentration (BAC) level was at 0.145, which is almost twice the legal driving limit. Dr. Tape ultimately could not determine the range from which the bullet was fired. However, Dr. Tape concluded that the wound was not a contact wound, which is more common in suicides.

Dr. Tape also explained why he determined the manner of death to be a homicide, stating:

> Q    Um-huh. Is there a process that you all have maybe to rule out whether or not a gunshot was actually accidental or not?
>
> A    Again, you have to have a compelling story. An accidental shooting is a gun [that] hits the ground and fires on [its own].
>
> Q    Um-huh.
>
> A    If somebody's finger is on the trigger, it's a suicide or a homicide. There is no accidental shooting. The gun can misfire but there's no accidental shooting. A firearm is designed to kill and nothing else.
>
> Q    So you don't have any test for that is what I'm asking.
>
> A    There's no test. If it's [a] gunshot wound, it's a homicide by default. So you have to talk, you have to prove to me [that] it's a suicide or an accident. You have to prove that that gun can fire on its own.

2

Officer Terrell Winslow of the Alexandria Police Department testified that on June 5, 2021, he was dispatched to 2501 Third Street in Alexandria, Louisiana, regarding a shooting. Officer Winslow stated that when he arrived on scene, he noticed the victim, a black female, later identified as Mikelia Busch, lying on the ground with a gunshot wound and another black female, later identified as Tiffanie Ellis, rendering aid to her. According to Officer Winslow, there was "well over a hundred people" and the scene was "chaotic," so other agencies, such as the Louisiana State Police and the Rapides Sheriff's Department, were called to assist in crowd control and to secure the scene.

Shuntavica Busch, Mikelia Busch's sister, testified regarding her recollection of the events that led up to the shooting. Shuntavica stated that she, her boyfriend Markez Thomas, and her sister Mikelia Busch, went to the VFW building in Alexandria, Louisiana, to attend a zydeco event hosted by a local trail ride group known as the CENLA Outlaws. According to Shuntavica, they arrived at the event around ten o'clock, right before zydeco singer Leon Chavis performed. Shuntavica said while they were at the event, they drank, danced, and listened to the music; she testified that she only had two mixed drinks.

Shuntavica testified that towards the end of the night, she went to the bathroom by herself and that's when an altercation inside the VFW occurred (the first altercation), explaining:

> Q    Okay. And so, you said you and your sister went to the bathroom twice and then you said after the second time, what happened after the second time that you went to the bathroom?
>
> A    Um. I went by myself.
>
> Q    Okay.

A     And so, when I was walking back, I walked, I was walking down the thing and, you know, as I said, you had to walk down a little stoop. As everybody knows when you go to trail rides, it's kind of like packed in.  Like everybody's real close.  And so, I, I didn't physically feel me touch anybody but, you know, it's real close so, you know, I just got close to somebody[,] so I turned to, you know, say, you know, my bad. But as I was turning, you know, she was, she was looking at me like, you know -

Q     Okay.

A     - it was a problem.

Q     Okay. So you didn't feel anything.  Did, but you felt that someone had a problem with you?

A     I just knew that it was [really] close.  So I didn't want anybody to take it as, you know, me just physically -

Q     Okay.

A     - touching them or anything.  Because, you know, it's real close. Everybody's real close -

Q     Okay.

A     - and around each other.  And so, you have to get through people to get where you're going.

Q     Right.  And so[,] a normal tendency for us is to say, you know, excuse me -

A     Yeah.

Q     - or something like that.  Was it one of those type[s] of situations?

A     Yeah.  I was turning to say my bad.

Q     Okay.

A     But she was looking like, you know, as if she knew me or something.  And so, she pushed me.

Q     Okay.

A     And, uh, you know, I looked at her and I stared at her for like five seconds and, you know, she was just like, looking like, you know, what's up? And she said, "What's up?"  And so, I was like, you know, well, what was up? You know, I didn't know.  It was like that, that type

4

of situation.  And she, I seen her swinging so we kind of both swung at each other at the same 'cause I seen her swinging[,] so I swung back.

Q     Okay.

A     And a situation happened inside.  My boyfriend didn't go to [the] bathroom with me but somehow the whole, it was a whole crowd of people swinging at me, back.  And so somehow he was, he did start like, I think he swung.

Q     He got involved?

A     Yeah, he got involved.

Q     Okay.  And did you, this other girl that you said that looked at you and, you know, said, "what's up,"  did she, did you know her?

A     No.

Q     Okay.  And you, then you say that y'all both swing at each other.  Okay.  Who was, who was around you right when that happened?

A     Nobody.  I was walking towards my sister and them.

Q     Okay.

A     And so, when my boyfriend got involved, I didn't know how he knew that it was going on.  He had to be watching.

Q     Okay.

A     Like from wherever he was standing, he had to be watching me.

Q     Okay.  And you see him come in.  Is that right?

A     Um-huh (yes).

Q     Okay.  And he starts, does he defend you?

A     Yeah.

Q     Okay.  [Are] there any other people that got involved in this physical altercation?

A     No, sir.

Q     Okay.  But you said there [were] other people swinging at you?

A      It was a whole crowd of people like, as I said, trail ride groups, I kind of just figured that they're with the trail ride group, like they were all together.  But, you know, when the situation happened like with me and her having a little altercation, words back and forth, but I didn't know that she was with all those people or whatever the situation was.  I just -

Q      Now when y'all both swing do you make contact with her?

A      Yes.

Q      Okay.  Does she make contact with you?

A      Yeah.

Q      Okay.  Is that the, did y'all get anymore punches?

A      Uh, the, all of them swung at me but I, I mean, I swung back.

Q      Okay.

A      But –

Q      So are you making contact other than the one punch that you said that you made contact with the girl that you didn't know?

A      Uh, probably like two more times.

Q      Two more times?

A      Yeah.

Q      And did you get hit anymore times than the one time that you-

A      Yes.

Q      Okay.  So what happens after this altercation occurs?

A      Um, I think they [had] security.  Well, they had people dressed in all black[,] so I guess that they [were] supposed to be the security.  And they came and escorted my boyfriend at the time out, which [was] Markez.  And I just followed behind them.  But at the time, my sister wasn't around -

Q      Okay.

A      - nowhere.

Q      Okay.

6

A      Like, I guess she, it had a video of her like somebody recorded her dancing -

Q      Okay.

A      - and then like in the video you can see that she noticed that, a fight.  And then she -

Q      Okay.

A      - like moved but she was nowhere around me.  At the time he got escorted out, I just walked out right behind him.

            . . . .

Q      Okay.  And you said that your boyfriend, Mr. Thomas, he gets escorted -

A      Yes.

Q      - by security. Right?

A      Um-huh (yes).

Q      Is he the only one or is -

A      Yeah, he's the only one.  Well, I don't know what happened after he got escorted.  Like, I don't know if they got escorted out, too, because I followed behind him.

Shuntavica stated that once she and her boyfriend left the VFW building, the woman with whom she got into a physical altercation with as well as the woman's friends followed them outside into the parking lot.  Shuntavica explained that while they were walking to the car, the people involved in the altercation started antagonizing them, stating: "Don't run out hoe, don't run out."  Shuntavica recalled Tiffanie Ellis stating that "if y'all gone fight go to the Dollar Store parking lot.  Don't fight in front of here."  Though she assumed the women had also parked around there, she felt "they coming, you know, for me."  Shuntavica testified that she eventually turned around and got ready to fight the individuals because she did not want them to jump on her while her back was turned and she did not feel as though

7

she had time to make it to the car. She testified that at this time, she was with her boyfriend and his three friends, two women and a man.

Shuntavica explained the ensuing altercation (the parking lot altercation):

Q    Okay. Are you getting prepared for some physical altercation to happen?

A    Yeah.

Q    Okay. And so, what happens?

A    Um, as she was tying my hair up, my sister, she came, she came, she [was] at the door, basically. Like I said[,] it's a long sidewalk.

Q    Okay.

A    And like we had just made, barely made it to the parking lot of the Dollar Store. So it was like we [were] at the front of the parking [lot], not at the front but like the side facing the VFW. And so all I see was like her hit and she was like, "Where the fuck my sister?" And that's when -

Q    Is that your sister saying that?

A     - yeah. And that's all I seen because after that they started swinging on me and, you know, I just started swinging back.

Q    Okay. Is your sister normally protective over you?

A    Very protective.

Q    Okay. And you say that, so who swings first? Are you swinging?

A    No, they swung at me. When I was looking, I was looking at her when they started swinging. I was looking at her because I heard her, she, she was yelling like where, asking where I was at.

Q    Is this the same girl that you and her swung at in [the] VFW?

A    What? Me and her swung at each other?

Q    Right.

A    Yeah. But it's other people, too.

Q    Okay. But is she the, is she the one coming at you at this point?

8

A       Um, it was like at that point, when I was looking at my sister, it was like three of them standing directly in front of me.

Q       Okay.  So you're saying that you're being swung at.

A       Yeah.

Q       And do you respond?

A       Yeah.  I [swung] back.

Q       Okay.  And tell me what happens.

A       Like, basically a fight. Markez was saying, the whole time I [sic] him yelling, "Quit jumping her, quit jumping her."  So we [were] just, I was swinging but I could tell [there were] more people on me.  And he was just like, "Quit jumping her, quit jumping her."

Q       Okay.

A       But I never seen him swing but, on the outside.

Q       Okay.  [Were] there, did it end up being one-on-one like Tiffanie Ellis said?

A       Never.

Q       Okay.  And so, you're saying that there's more than one girl that you're fighting with?

A       Yeah.

Q       Okay.  And what does your boyfriend do?

A       Uh, I just kept hearing him say, "Stop jumping her, stop jumping her."  I think he was breaking it up. I never seen him swing.

Q       Okay.  Did you, did you get hit?

A       Yeah.

Q       Okay.  And did you hit other people?

A       Yeah.

Q       Okay.  And so that happens.  And what happens next?

9

A      Um, after I see my sister come out, well, I see her coming out and yelling.  You know, I was fighting.  And the next thing I know, Markez pushed me to the ground[,] and he laid his body on top of mine.

Q      Okay.  You said he laid his body on top of yours?

A      Um-huh (yes).

Q      Okay.  And why was he doing that?

A      Um, later, like after everything he said that he actually heard somebody say, "She gotta [sic] gun."  I never actually heard that, so.

Q      Okay.  I want to go back to the physical altercation that you said that you were in.  You said that there [were] three people swinging.  Right?  Do you know who they were?

A      Um, I know for sure it was [the person] that I got into it with, I mean, I had the words with, it was her sister.

Q      At the VFW?

A      Yeah.

Q      Okay.

A      It was her sister.  And it was -

Q      And you said it was her sister.

A      Uh -

Q      Whose sister?

A      Uh, the girl that I go [sic], had words with in the inside.

Q      Okay.  So the girl that you had words with inside was not the girl that you were in an altercation with.  It was her sister?

A      No.  It was all three of them.

Q      Okay.  It was all three of them.  So[,] there [were] two sisters?

A      On the outside.  No.

Q      Okay.

A      It was her, her, her sister, and it was her, Ke'Undra.

10

Q    Okay.  So[,] it -

A    But [there were] more people that came out there with them.

Q    Okay.  So, the three people are, that you're swinging on and they're swinging on you[,] is the girl that you had words with in [the] VFW, her sister.  Is that right?

A    (No verbal response.)

Q    And then you said Ke'Undra Walker?

A    Yeah.

Q    Okay.  And then you say that your boyfriend jumps on top [of] you.

A    Yeah.

Q    Right?  Okay.  And I think you said it earlier[,] but you said that there was a shot [ ] fired?

A    Yeah.

Q    And what happens right after that?

A    Um, I kind of, we didn't stay down long.  After he pushed me to the ground and got on top of me, I got up.  When he got off of me, I got up. It was like real[ly] quick. And so, when we got up . . . I'm just, I see her laying down on the ground.

Q    And who's laying down?

A    My sister.

Q    Okay.

A    And so, you know, I thought, you know, when you get, if you get in a little altercation and, you know, you hit somebody the wrong way, you can knock 'em [sic] out.  And so, at that point she was laying like flat on her back.  So, you know, I wasn't sure if she had got knocked out or whatever, you know, I was just going around.  At that point, I'm just like, you know, who did it?  You know, I'm going around asking, "Who did it, who did it?"  And, um, you know, I'm just, I'm going around in a circle because at that point it's a lot of people out there.

Q    Okay.

A    And so, I had, I came face to face with Ke'Undra.

11

Q      Okay.

A      And she had a gun.

Q      Okay.

A      And she told me [to] get the, I better get the "f" back [] or I'm next.

Q      Okay.  Now what was she doing with the gun?

A      She was just holding it.  Holding it up.  But at that point, I knew, okay, maybe she's not just knocked out because, but I didn't see any blood.  [There] wasn't any blood anywhere.

Q      Okay.

A      And so at that point, me and Markez went up to my sister and he put his hand under her [head].  Because when you see a gun in your face, of course, you not gone [sic] sit there.

Q      Right.

A      Like, you gone [sic] move, move around.

Q      Okay.

A      But -

Q      Did, Ke'Undra Walker, did she ever point the gun at you?

A      Yes.

       . . . .

Q      All right.  And so after you said that you saw her, [she] had a gun and you said that she pointed it at you and she said what she said, did you see what she did next?

A      No.

Q      Okay.

A      'Cause I, I immediately -

Q      Went to your sister?

A      - went to my sister.

12

Q      Okay.  And when you went to your sister, what happens after that?

A      Uh, Markez picked, put his hand under her head.

Q      Okay.

A      And that's when we knew she got shot because she had blood coming all out.

Q      Okay.

A      Well, he had blood all over his hands.

Q      Okay.

A      And so he took his shirt off and he tried to put his shirt on the back of her head.  We really didn't know where it [came] from.  But from when he put his hand under her head, he was getting blood all over his hand.

Q      Okay. Did you, did you see anybody else helping your sister?

A      Tiffanie Ellis.  At that point she came[,] and she started giving her CPR.

Q      Okay.  And did, at that point, you, your boyfriend and Tiffanie Ellis are around your sister trying to help her.

A      Yes.

Shuntavica described her boyfriend, Markez Thomas, as a non-violent person and stated that she had never seen him hit a woman before that night. Nonetheless, Shuntavica admitted that Markez hit two women to defend her during the altercation that occurred inside.  According to Shuntavica, one of the women fell to the ground after being hit by Markez; however, Shuntavica could not definitively state whether the woman was "knocked out."   Shuntavica also stated that she did not know the identity of the woman who Markez knocked down.  Shuntavica testified that her sister, Mikelia Busch, allegedly got into an altercation outside as well, but she did not actually see her sister fight anyone.  Shuntavica admitted that she did not hear

13

nor see the gunshot. According to Shuntavica, the only weapon she saw that night was in the hands of Defendant.

Sergent Christopher Jenkins of the Alexandria Police Department testified that he was the crime scene investigator in the case. Sgt. Jenkins stated that on June 5, 2021, he received a call about a shooting that occurred at Third and Broadway in Alexandria, Louisiana. Sgt. Jenkins noted that when he arrived, he was informed that "a group of females had gotten into an altercation at the VFW which had spilled out into the parking lot of the Family Dollar." Sgt. Jenkins stated while at the scene, he collected evidence; however, he noted that he did not find any firearms or cartridge casings. Sgt. Jenkins noted that during his search for evidence, it started raining. Sgt. Jenkins explained that he collected all the evidence he could and photographed the things he believed were significant.

Captain Debra Blackwood of the Alexandria Police Department testified that on June 5, 2021, she was the shift lieutenant who responded to a call regarding a shooting at the corner of Third and Broadway in Alexandria, Louisiana. Cpt. Blackwood stated that there were approximately two to three hundred people in the area. According to Cpt. Blackwood, when she arrived at the scene Tiffanie Ellis and Officer Winslow were attempting to perform CPR on the victim, Mikelia Busch. Cpt. Blackwood noted, however, that Mikelia was unresponsive. Cpt. Blackwood stated due to the number of people in the area, she had to dispatch additional agencies, including the Louisiana State Police and the Rapides Sheriff's Office, to control the crowd and secure the scene.

Tiffanie Ellis testified that she was a member of the trail ride group, CENLA Outlaws, that hosted the zydeco event at the VFW building on the night of the shooting. Tiffanie stated that night, "Uncle Zed," a friend of the CENLA Outlaws,

escorted a young man out of the event due to something that had occurred; however, Tiffanie said she was unsure of what happened. Tiffanie explained that about five to ten minutes after the young man was escorted out of the building, she went outside to smoke a cigarette and noticed that there were women fist fighting in the street, including the victim, Mikelia Busch, and "Missy," also known as Ahlandriea Carter. According to Tiffanie, she attempted to break up the fight to no avail. Tiffanie said she told the women that they could not fight at the event, so the women walked over to the Family Dollar parking lot. At this point, Tiffanie testified that more people were coming out of the VFW. Tiffanie stated that she followed the women to the Family Dollar parking lot because she had Mikelia's car keys and wanted to give them back to her. Tiffanie testified that once everyone made their way to the Family Dollar parking lot, fights started to break out between multiple people, including Mikelia and Ahlandriea. According to Tiffanie, Defendant was not around those who were fighting. Tiffanie testified that she watched the whole fight between Mikelia and Ahlandriea Carter, she did not see who threw the first "blow," but noted that no one else jumped in that fight. During this time, she was aware of other fights going on simultaneously. Tiffanie also heard a gunshot, but she did not see a gunshot; she also testified that she did not see anyone with a gun that night. According to Tiffanie, after the shot was fired, she heard Mikelia hit the ground and noticed that she was not moving. Tiffanie explained thereafter, she started administering CPR to Mikelia. While administering CPR, Tiffanie noticed Mikelia did not have any kind of response, such as a pulse, and when she checked Mikelia's body, Tiffanie noticed that she had a gunshot wound on the back of her head. According to Tiffanie, she administered CPR to the victim until the police arrived.

Bishop Dorn testified he attended the VFW event on the night of the shooting. Bishop stated that he rode with his sister, Reginae Hamilton, and her boyfriend, Corey Anderson, from Natchitoches to the event, but rode home with Timira Johnson. Bishop said before the concert ended, he went outside to retrieve his gun from his sister's vehicle. Bishop testified that he did not want to bring his weapon inside of the VFW building, so he waited outside for Timira for approximately thirty to forty minutes. According to Bishop, while he was waiting, a woman and her boyfriend went outside and started arguing in the street; he identified the woman as "Tootie Pop" and the man as "Kez." Bishop stated that another woman followed them and tried to confront them. Bishop said then, other began to file out of the VFW building behind them. According to Bishop, the group of people, approximately seven to ten people, walked to the Family Dollar parking lot and eventually, a fight broke out. Bishop saw Mikelia that night and recalled Mikelia was trying to stop her sister from fighting. Bishop stated after the fight broke out, he heard a pop, which sounded like a gunshot. According to Bishop, he did not see anyone draw a weapon that night. Bishop stated after he heard the gunshot, he got into Timira's car, a black Hyundai. Bishop explained that he was in the backseat behind the driver, Timira was in the driver's seat, Defendant, known to him as "B," was in the passenger seat, and another woman was in the backseat. According to Bishop, Defendant had a firearm with her in the vehicle. He also stated that the woman in the back was bleeding from the arm, and that he gave her his shirt to wrap around the wound. Bishop testified that Timira drove the whole time, that they dropped Defendant off and, shortly thereafter, the police pulled them over. Bishop recounted that during the traffic stop, the police searched Timira's vehicle; Bishop noted, however, the only weapon they recovered was his firearm.

16

On cross-examination, Bishop clarified that no physical fight occurred in the street; the pushing and shoving started once the group moved to the Family Dollar parking lot. He further added that the pushing and shoving involved men, but that he could not tell if men were pushing women. Bishop also identified men in both groups.

Timira Johnson, who at the time was charged with accessory after the fact, testified for the State but explained that she was not promised anything for her testimony. She testified that she was at the zydeco event at the VFW on the night of the incident. She was with her friend, Katherine Rachal, and her cousin, Deaundria Carter; Timira said they traveled together from Natchitoches to Alexandria. Timira mentioned that Deaundria also goes by "Nachi," and her sister, Ahlandriea Carter, also goes by "Missy." Timira stated that they planned to meet other friends at the VFW: Eric Berryman, Josh Levo, Ahlandriea Carter, and Defendant. When they arrived, they parked in the Family Dollar parking lot, walked over to the VFW building, and went inside. Timira testified that she did not drink that night, as she was the designated driver.

Timira described the end of the night and the first altercation inside of the VFW as follows:

Q    So as the even[t] is ending what, what happens?

A    I see Tootie Pop. She walks up to my cousin and they just kind of start arguing. I really don't really know why they were arguing[,] but Deaundria tries to walk off kind of and then she [was] still like walking up to her trying to argue.

Q    Okay.

A    So that [is] what end[s] up happening like at the end of the event.

Q    Okay. So are you seeing them inside VFW arguing?

17

A    Yes.

Q    Okay.  So you said Tootie Pop.  Is her real name Shuntavica?

A    Yes.

Q    Okay.  So you see Shuntavica Busch, that's her last name?

A    Um-huh, yes.

Q    And you see Deaundria Carter.  They're arguing.

A    Yes.

Q    Okay.  After you see them arguing, what do you see next?

A    A fight just breaks out.  I'm not sure who threw the first punch[,] but the fight just breaks out and people start jumping in.  So at that time, I jumped in too.

Q    Okay.  And that's inside the VFW?

A    Inside.  Yes.

Q    Did you see, did you see Tootie Pop or Shuntavica throw any punches?

A    I, I don't know who threw punches.

Q    Okay.

A    I know punches were thrown though.

Q    Okay.  So[,] you just know that the fight is going on?

A    Yes.

Q    Okay.  But you can't say who?

A    No.

Q    Okay.  Then what happens next?

A    Um, when I go to swing[,] a boy comes from the corner and he hits me and I fall kind of back on Ahlandriea and on the speaker.  So we're on the ground at that point trying to get up.

Q    Okay.  So, do y'all get up?

A    Yeah.  We end up getting up and then the fight kind of ends right there.

Q    Okay.

A    It kind of dies down.

Q    Is anybody escorted out of the building?

A    I wouldn't say escorted.  We kind of all just walked out on our own.

Q    Okay.  Did you feel like the event was over and it was time to leave?

A    Yeah.  The event was over before, I felt like it was [time] to leave before the fight even started.  The event was over.

Q    Okay.

A    'Cause they stopped playing zydeco music by then and everything.

Q    [O]kay.  And so you get up and where do you go next?

A    We start walking towards the door.  We all as a group walk towards the door.

Q    Okay.  And the group, is that the same group that you arrived there together?

A    Yes.  And the group that I met with in the parking lot.

Q    Okay.  And so I'm assuming you exit the building.

A    Yes.

Timira testified that when they exited the VFW, there was nothing going on in front of the building or in the street.  However, she testified that the group of people that got into a physical altercation with them inside followed behind and taunted them.  Timira said when she reached the parking lot, she saw her ex-boyfriend, Bishop Dorn, who was waiting on her, and that other people she did not recognize were in the parking lot.  Timira approached Bishop, walking away from

19

her group, and explained to him what had occurred inside the VFW. According to Timira, her back was turned to the crowd, so she did not see anyone fighting, but she recalled hearing people argue. Timira did not turn around until after she heard the gunshot and that's when she saw Mikelia lying on the ground. She testified that, prior to the gunshot, she was not afraid for her life.

Timira stated afterwards, she, Bishop Dorn, Ahlandriea Carter, and Defendant got into her car and proceeded to leave the scene. Timira recalled that Bishop was sitting in the front passenger seat, Ahlandriea sat in the back driver's side seat, and Defendant sat in the back passenger's side seat. According to Timira, Defendant had a gun in her possession when she entered the vehicle. Timira stated she was so nervous driving that she pulled over and allowed Bishop to drive. Timira explained that they brought Defendant to St. Maurice, and that when they dropped her off, Defendant was still in possession of the gun.

Timira testified that she witnessed Defendant holding the gun prior to Defendant getting in the vehicle:

> Q     When you heard the gunshot, did you ever, after you heard the gunshot, did you ever see Ke'Undra Walker before she got in the vehicle with you?
>
> A     I [saw] her. Yes.
>
> Q     Okay. And where do you see her?
>
> A     Like with, standing with everybody else where everybody else was.
>
> Q     Okay. And did you see that, at that point, when she's standing with everybody else, did you see that she had a gun?
>
> A     Yes.
>
> Q     Okay. Was it in her hand?
>
> A     Yes.

20

Q       Okay. Was it, was it held up or by her side?

A       It was, she was kind of like [talking], you know how you talk with your hands? She was kind of like waving it[,] but it was only 'cause [sic] she was talking with her hands. So, like, and the gun was still in her hand.

Q       Okay. So she was talking[,] and the gun was going something like this (indicating).

A       Yeah. She wasn't like pointing it at nobody or nothing[,] but she was like talking, so.

On cross examination, Timira denied having posed for a police lineup, despite counsel indicating she was picked out of a police lineup. She also acknowledged that she was initially charged with first degree murder. Timira also provided more details about the altercation that occurred inside of the VFW. Timira testified that Shuntavica bumped into Deaundria in a way that indicated Shuntavica wanted to fight. She testified that approximately ten people were involved; initially, the fight started between Deaundria and Shuntavica, but when "[a] lot of people from her side of the group jumped in[,]" she did as well. Furthermore, while men in the other group were involved in the fighting, men from Timira's group were simply trying to break up the fight. Regarding the altercation outside, Timira recalls her group simply trying to get to their car to leave but being harassed as they attempted to leave. According to Timira, she gave Defendant a ride home because she was scared, as she knew Defendant had a gun and had "just shot someone."

Ahlandriea Carter testified that on the night of the incident, she, Defendant, Josh Levo, Eric Berryman, Timira Johnson, Deaundria Carter, and Katherine Rachal, all met at the VFW building for a zydeco event. She, Defendant, Eric Berryman, and Josh Levo rode together in Eric's truck.

21

Ahlandriea stated that towards the end of the night, the following events occurred:

Q      Okay.  Tell me what happened from your point of view, please, ma'am.

A      Well, I don't know the girl['s] name but from the other side.  She was a short girl.  I heard y'all mention her last name yesterday.

Q      Okay.

A      Ms. Busch.

Q      Okay.

A      She, I guess, she was intoxicated but I'm not even try[ing] to guess because she was bumping into Eric Berryman and my sister, Deaundria Carter.  So when they turn[ed] around, the guy just was like, you know, she was drunk, that he had her.  So they turned back around.  So we heard some commotion in the back and so naturally, everybody turned because they heard a lot of noise in the back over the music.  And, uh, she was kind of going off cussing and saying that she was gonna [sic] slap the piss out of somebody.  But nobody knew who.  So she made eye contact with my sister.  And my sister was like, "Me?"  And she was like, "Yeah, you," or whatever.  And she went to swing on her but the guy that was in the middle, 'cause my sister went to swing back, he grabbed her.  And so, nobody restrained her so, Ms. Busch.  So at that time, Timira went to, I don't know if she was gonna [sic] strike Ms. Busch or what, but the guy then punches her in the mouth.  So once he punches her, she falls back on Ke'Undra.  And Ke'Undra falls back.  So I pick both of them up once -

Q      Okay.

A      - the guy punches -

Q      Okay.

A      - Timira.

      . . . .

Q      So Ke'Undra's down.  Timira's down.  The boy's no longer holding Ms. Busch.  What's the boy doing?  Do you know?

A      I mean, it was a lot of 'em.

Q      Okay.

22

A      So at this point they started rushing towards –

Q      How many of them?

      . . . .

Q      . . . You may not be able to correctly estimate but when you say a lot, I mean, you could mean like a hundred people. You could mean fifty. You could mean twenty. You could mean ten. And so, the way I try to get it is it had to be no more than this many. How many people would you say when you say a lot of them are causing a fight inside?

A      I would say like about fifteen or twenty of 'em. But they hadn't even started fighting yet because, like, they were rushing us and by that time, Tiffanie had came up –

      . . . .

A      - Ellis. And once she came up and she asked me what was going on, I said, "I didn't have, have any idea. Just let them go and then we will leave," after she released them basically. Let them leave out first.

Q      All right. I want to make sure I understand what you're saying. You're telling me that inside the club after this initial fight –

A      Um-huh.

Q      - the punch was really a dude to Timira and then what happened after that, fifteen to twenty people are rushing y'all. Nobody threw any licks but you got a rush of fifteen to twenty people.

A      Um-huh.

Q      And then Tiffanie comes up to you and asks you what's going on.

A      Um-huh.

Q      How does Tiffanie know you?

A      From Facebook. Like, we don't know each other but we were was [sic] friends on Facebook.

Ahlandriea stated that after the fight ended, "Tootie Pop," also known as

Shuntavica Busch, and her boyfriend, Markez Thomas, left. But the remainder of

the people stayed. Ahlandriea testified that they waited five to ten minutes before leaving to let the situation die down.

Ahlandriea said they eventually left the building and headed towards the parking lot, wherein the following occurred:

Q     Okay. And so we get outside the doors and now we're outside the VFW. What happens?

A     Um, at that point, the Tootie Pop girl is at the stop sign and the boy. And when we were coming, the group kind of followed us but they [weren't], at that moment they [weren't] like making noise or nothing like that. So at that point, Tootie Pop came back down the road with the boyfriend as we were proceeding to go to our cars. And she started going off and said she wanted to fight the girl in the yellow shirt. And the girl in the yellow shirt was my sister. And then Mikelia and there was this other girl, they were talking noise and I'm telling them that we did not want to fight. What's the point of fighting? And nobody ever would just say, she just was like, "I just want to fight the girl in the yellow shirt." And I'm like, "Well, that's not gone [sic] happen. We [are] not fighting. And plus[,] that's my sister." So I went into protection mode, like, I'm not letting her fight nobody. Like, we [are] not fighting, 'cause -

Q     Okay.

A     - we not, what's the point?

Q     And at the time that you're saying we're not fighting, are you trying to get in the middle of them and saying, hey, stop?

A     No. My sister was behind me. I was just telling her that we didn't want to fight. She was coming from that way. The people had already came and spread it out[;] however, I'm not really even paying attention to them at this moment. I'm only kind of engaging with her and then I did, like I said, and I [saw] the Mikelia girl and it was another girl, don't know her name, and they were kind of like talking noise. They [were] walking around or whatever[,] so I was kind of having my eyes on the people that [were] talking and moving at that moment.

Ahlandriea testified that her group was trying to walk to their cars, but "they kind of lined up so we would have to go through them to get to [the] cars" and Shuntavica remained adamant on fighting.

Q     Okay. And so, does your sister and Tootie Pop ever get into it?

24

A      No. They never had words. Tootie Pop was the only one talking. I was the spokesman for everybody.

Q      When I say "get into it", I mean start fighting.

A      Okay. Yeah. Once she ran, ran in, she swung at my sister, they start fighting. So before I could even engage, I was hit on the back of my head by Mikelia.

Q      Okay. Now, I'm not contesting that you didn't[,] but you said she hit you in the back of the head. How [did] you know it was her?

A      Because when I turned around started fighting, I [could] see.

Q      She's the one standing there. Right?

A      Yeah.

Q      Okay. So, she pops you in the back of the head first. Right? And then you turned around and start[ed] fighting her.

A      Yeah.

       . . . .

Q      Okay. And you're swinging at Mikelia?

A      Yeah.

Q      Okay. And is she swinging back at you?

A      Yeah.

Q      All right. At some point you feel like there's more than one person fighting you?

A      Yeah.

Q      Okay. And as y'all are going back and forth, were you winning? Were you losing? How was it going for you?

A      I wouldn't say I was winning if I'm looking at my foot.

Q      Okay. And so, when you say you're "looking at your foot", what I think in my head might be right or wrong, is they've got you down like that. Is that right?

A      Yeah.

Q      Okay.  So you're bent over at the waist at this point, right, and you have at least thrown and received some licks and you're not even sure how many people are fighting you.

A      Yes.

Q      And you're looking down and it's that point when I think something else happens.  I don't know, but does it?

A      Um, I felt my arm, like this.

Q      Okay.

A      Something hot.

Q      Okay.  So, did you hear anything?

A      A pow.

Q      Okay.  So that was a gunshot.  Right?

A      Yeah.

Ahlandriea testified that after she received the gunshot wound to her arm, she was in shock, but her sister grabbed her and moved her to a safe location.  Ahlandriea did not know if anyone else had been wounded by the gunshot.  According to Ahlandriea, she did not see Defendant with a gun that night, but she knew that Defendant normally carried a gun with her.  Despite this testimony, the prosecution had Ahlandriea review and then read from her statement to the police, wherein she stated that she saw "her" fall back and that Ke'Undra, her cousin, had the gun.  After reading her statement, Ahlandriea maintained that she did not see Ke'Undra "with [her] own eyes" but assumed because "Tootie [P]op walk[ed] up to her and [said] that."  Ahlandriea further testified that she did not recall Ke'Undra taking anything with her when she exited the car, but in her statement to police, read during trial, she stated Ke'Undra had the gun with her when she got out of the car.

26

Sergeant William Bulter of the Alexandria Police Department testified that on June 5, 2021, he was called to the scene of a shooting located at 2501 Third Street. Sgt. Butler stated that when he arrived at the scene, he spoke to different officers to get an understanding of what happened, and he also identified the body of the victim, Mikelia Busch. According to Sgt. Butler, he spoke to numerous people in the crowd to determine the identity of the shooter; however, he stated that everyone had the same story: "They had heard the shot but didn't actually see who fired." Sgt. Bulter said Tiffanie Ellis later identified the shooter as Timira Johnson.

However, interviewing Bishop Dorn, Ahlandriea Carter, and Timira, Sgt. Bulter did not believe she was the shooter. According to Sgt. Bulter, Defendant then became a possible suspect. Sgt. Bulter stated that Defendant eventually turned herself in and the following events occurred:

Q Okay. And does she make any comment after that?

A I advise her she is under arrest for the warrant. I explain to her the upcoming process as far as being booked in the jail, the immediate process that's about to happen to her and then ask her if she has any questions for me. She states after, or she asks me once she obtains a lawyer could she make a statement because, and I want to quote it, "I don't want to be labeled a cold-blooded killer."

Sgt. Butler stated the only firearm recovered in connection with the case was the one found on Bishop Dorn's person during his arrest. Sgt. Butler also testified that the bullet recovered from Mikelia's body was not matched to any firearm because it was unsuitable for comparison.

Defendant decided to testify at trial. In her account of the events occurring on June 4th and 5th, 2021, Defendant recalled that she rode with Eric Berryman, Ahlandriea Carter, and Josh Levo from Natchitoches to Alexandria for a zydeco concert. They arrived around ten o'clock, and at that time, she had her gun in her

27

possession. Defendant explained that she regularly carried her gun with her as protection from her ex-boyfriend who would get drunk, go to the events she attended, and start fights with her. By having the gun, he would not bother her. She purchased the gun, a Ruger, from a local shop in Natchitoches in 2019 and the gun is registered to her. Defendant stated that she did not receive any safety training with her gun, but she previously had firearms training at one of her past employments. According to Defendant, she never shot the gun prior to this incident.

Defendant testified that she had never met the victim, Mikelia Busch, or her sister, Shuntavica Busch, before the night of the shooting. Defendant recalled their first encounter as follows:

> Q     At what point during the night that, I guess, you or your group or anybody else that you, that was with you all, came in contact with Shuntavica Busch, if you remember?
>
> A     We were dancing[,] and I just remember her like coming through like she almost knocked my cousin, my little cousin['s] shoulder off. And, uh, they, you know, exchanged words or whatever. And at first, the boyfriend just like, you know, she good, you know, she, you know, she [has] been drinking, you know. But she still, you know, kept on. I guess she call[ed] herself trying to start like dancing beside us or whatever. So, you know, we [were] still dancing. Next thing you know, it [was] like, you know, it was like, you know, she was, you know, know, intentionally like -
>
> Q     We're going to get to that. We're going to get to that. You say that she, did you actually see her bump into anyone?
>
> A     Yeah.
>
> Q     And who was that person she bumped into?
>
> A     Nachi.
>
> Q     Nachi. And who else? And what, does Nachi go by another name?
>
> A     Deaundria Carter.
>
> Q     Deaundria Carter. Okay.

28

A    Yes, sir.

Q    When that happens, you stated something about an argument.

A    Yeah.  They kinda [sic] sorta [sic] like exchanged words and I, my focus had like went somewhere else.  And when I looked up, a boy, a man was hitting Timira[,] and she fell up against me and like we kinda [sic] slid like to the speaker.

Q    Okay.  Well, before we get there[,] was Mikelia Busch involved in any of these arguments?

A    Not that I can recall at the moment.

Q    And you did state that the actual argument turned physical[,] or the physicality just came from someone else?

A    I'm guessing the argument, you know, became physical.  Like, I don't -

Q    Okay.

A    - like I say, I don't, I don't know if they knew each other.  I don't know like what type of, but it was like, you know, like she really wanted to, I guess, fight her.

Q    Do you know, only if you saw it, do you know who actually threw the first punch?

A    I never even seen her.  I never seen the licks between the two. Like what stopped me up in my tracks was like, you know, when, I guess, they had got loud over the music so like I had, we all like got in defense mode like, what's, what's going on, you know?

Q    So did anyone in your group other than Timira get hit inside the VFW?

A    No, sir, not that I can recall.

Q    And as far as Timira, did you see the person that hit her?

A    Yeah.

Q    Did you know the person's name?

A    No, sir.

Q    What did the person look [like]?

A    He was a, a boy.  He had on, I remember him having on a red cap.  He might've, he was probably like a little taller than me.  Well, I'm short so everybody [is] taller than me.

Q    Um-huh.

A    But he was taller than me.  That's all I can really just remember.

Q    Okay.  But you specifically saw him hit her?

A    I seen him swing and hit her.

Q    Okay.  So does that guy get involved in the fight or he just hit the person and then that was it for him?

A    I mean, he, he was swinging.  And so, next thing you know, um, I remember somebody coming, you know, like escort[ing] him out.

Q    Did you get into a fight inside of the VFW?

A    No, sir.

Defendant stated that after the fight broke out, they waited two to three minutes before leaving the building.  When they walked outside, Defendant described the events leading up to the second altercation:

Q    So now let's walk outside now [sic].  Let's slowly walk outside.  So[,] I may have to stop you.  So[,] you walk out the door.  What happens?

A    I walk out the door and, um, we proceed to come down the sidewalk, come out the door and went to our, went to the left to, you know, to go ahead to our vehicle and, um, I remember seeing a girl and her boyfriend, you know, they [were] already, you could say in the middle of the street and, you know, she seen us coming out and, you know, she really, you know, by the time we made it to her, I don't know if she, I don't remember if she met us halfway but some kinda [sic] way, like we all [were] like, you know, face to face.  And I'm guessing the girls that [were] with her[,] they came, they had to have been the ones like coming out behind us 'cause it had people coming out behind us, too.  And -

Q    Okay.  Let's just stop right there.  Is the person that you're talking about Shuntavica Busch?

A    (No audible response, court reporter notes indicate affirmative response.)

30

Q Okay. So she was the one that you saw when you went outside.

A Yes, sir.

Q Did you see her boyfriend when you went outside?

A Yes, sir.

Q Was there anyone else with them at this time?

A Right now I really can't recall.

Q Does an argument or anything like that start between the two groups?

A Yeah. Um, like I say, we [were] coming out and we can hear, I mean, well, it's a group coming out behind us[,] and then I hear Tiffanie Ellie [sic]. She just was yelling, "It's gone [sic] be one-on-one, it's gone [sic] be one-on-one." You know, by this time, you know, we, we [were] still walking and, um, we [were] up in the middle of the road. We [were] really trying to, you know, trying to go but by this time we done [sic] made it to the road because the girl, she was, you know, we, I guess, we all [were] coming toward each other. And, um, I remember Ahlandriea, she was just like, uh, you know, "we ain't fixing to [sic], you know, it's not fixing to [sic] be no fightin'." It got, you know, men out here hitting women. She was like, "we, we fixing [sic] to go," you know. She just, I remember her saying, "Y'all come on." So she, we steady, you know, trying to go or whatever but in the midst of us, you know, steady trying to leave, the, um, the Shuntavica girl, like she just was getting up in all our face. She was just like, "What's up? What's up? Like, what?"

. . . .

Q Okay. So who was Shuntavica directing, I guess, her, I guess, who – let me say it this way. Who was she talking to when she was up in people's face?

A She really wanted to fight Nachi. But Nachi, you know, she was behind us or whatever. Well, she was really behind me and Ahlandriea. And I'm guessing she was talking about Nachi but she was still like, you know, going from me to Ahlandriea to, I'm thinking KK was standing right there, too. And by this time, we got like a group around us or whatever. She was like, "What's up?" You know, "What?"

Q Okay. And so you said "a group around you," where were you all located at that time when this happened?

A By this time we, we in the middle of the road.

31

. . . .

Q      Okay.  So[,] when you're in the middle of the road, did anybody fight while you were actually in the middle of the road?

A      No.

Q      Okay.  And so[,] you were in the middle of the road and now you start to walk towards your vehicle.  Right?

A      Yes, sir.

Q      And when did an actual fight start there?

A      Um, I remember me and, me and Ahlandriea, we had made it to our ride.  Like, we [were] right there by the truck really just waiting on, waiting to see if we [were going to] see Eric or, you know, see if somebody gone [sic] come unlock the truck.  And so, um, uh I remember Nachi going like behind the truck.  I'm guess[ing] she was trying to go get in the car.

Q      Okay.

A      And so the next [thing] you know, you know, the fight really just broke out from there.

Q      Did you see, I guess, the first person to throw a punch?  Did you see that?

A      No, I didn't see the first person [to] throw a punch.

Q      Did you want to fight that night?

A      No.

. . . .

Q      What about Mikelia Busch, was she there at that time?

A      By then I did see like, you know, the group of girls or whatever, like from the middle of the street, that's when, you know, like I say, they was around us and stuff.  And I'm guess[ing] they [were] getting in, you know, in position like trying to figure out like where they gone [sic] get in at.

. . . .

Q      And so you're saying, was Mikelia Busch at that point behind you, on the side of you, in front of you?  Where was she?

32

A       When we made it to the truck?

Q       Yes.

A       She was in front of me like she was over there by her sister.

Defendant testified that once the fight broke out, Ahlandriea Carter, Deaundria Carter, Mikelia Busch, and Shuntavica Busch were all fighting. According to Defendant, at one point both the Busch sisters jumped on Ahlandriea, so Defendant attempted to break up the fight, but then became involved when one sister started swinging at Defendant. When Defendant attempted to pull the girl off of Ahlandriea, Shuntavica's boyfriend, Markez, hit her, describing it as a "hard blow to [her] head."

Defendant testified thereafter, she pulled out her gun, stating:

Q       So, but when the ladies, when you were fighting another lady, did you pull your gun out at all?

A       No, sir.

Q       Okay. So at what point did you actually pull out your gun?

A       When I felt a hard blow.

Q       When you felt a hard blow.

A       Yeah.

Q       Okay. And then you pulled your gun out?

A       (No audible response.)

Q       Okay. And so, walk us through that process there.

A       He was coming toward me.

Q       Who is he?

A       The boy, the man. He was coming toward me.

Q       Are you talking about the person that you had seen -

33

A      Hit Timira.

Q      - knocking Timira down.

A      Yeah.

Q      In the, okay.

A      Yeah.

Q      He was coming towards you.  Right?

A      Yeah.  He was coming toward me[,] and I remember backing back like, but as I was backing back, I [saw] like a whole group over here.  I [saw] Ahlandriea like her head was down and it was like a whole bunch of people around her like, I can't recall right now if, if they [were] swinging and hitting her at that time but I was going back.  But when he seen that I had pulled my gun out -

Q      What for? Let's, we [are going to] get you there.  You stated that you were actually, you said that you pulled your gun out.  When you pulled your gun out, show me, I guess, tell me how you pulled your gun out.

A      I just pulled it from right here.

Q      Pulled it out, just pulled it out.  It was in your back pocket or?

A      No.  It was just like on my side right here, like the handle of it.

Q      Okay.

A      You could see it right there.

Q      I gotcha.  So[,] he's coming towards you and what did you do?

A      I was backing back.

Q      You're backed back.

A      Yeah.  And I -

Q      Did you say anything to him or anything?

A      Yeah.  I told him, I said, "You better get back."  And he was like, "Bitch, I ain't scared of no gun."

       . . . .

34

Q     Okay.  When he said, "Bitch, I ain't afraid of no gun," how did you feel at that time?

A     I was scared.  I was like, you know, I don't know if he gone [sic] hit me again or like what, you know.

Q     Tell the [j]ury what happened after that.

A     When, um, I was walking backwards and he was like, "Bitch, I ain't [sic] scared of no gun," I was scared.  And all I can do is pull my, pull my gun.  When I pulled it back, it just, it went off.  And it missed him and the, the girl fell.  But I didn't know that it was gonna [sic] go off like, so I was shocked.  I was like, kinda [sic] like standing there in shock like, what?  You know, what just happened?  And I remember a girl, you know, I seen a girl fall but I was like, you know, like it wasn't supposed to happen.  And so I remember the, Shuntavica girl, she did walk up to me[,] and she was like, "You [are] going to jail," you know, and I'm already in, in defense mode.  So I'm like, "You better get back." And so she just -

Q     And when you said that "you better get back," did you ever point the gun at her?

A     No.  I never pointed my gun at [anybody].

      . . . .

Q     Um-huh.  And so, you pulled your gun at [sic].  What was your intention when you pulled your gun out?

A     My intentions [were] to shoot in the air and fire a warning shot.

Q     Okay.  And did you ever have an opportunity to shoot in the air?

A     No.

Q     What happened that prevented you from shooting into the air?

A     My gun just went pop.  And it made my, my hand jack back like this.

Q     Okay.  And are you right-handed or left-handed?

A     I'm right-handed.

Q     Right-handed.  Did you actually pull the trigger?

A     No, sir.

Q      So you're saying when you cocked it, you actually cocked it, did you cock it upward, downward, straight ahead?  How did you cock it?[]

A      I, I cock[ed] it downward.

Q      Cock[ed] it downward.

A      I was standing up and I remember pulling it back and when it, when I pulled it back, I don't remember as I was pulling it back did it go off or when I released it, it went off.  I just know my hand went like this and I just heard a pow.

Q      Um-huh.

A      And I was just standing there.

Q      Did you know that there was a bullet in the chamber?

A      No, sir.

According to Defendant, she did not intentionally try to shoot anyone.  She eventually made it home to Natchitoches with her boyfriend, but did not have her phone.  At some point her boyfriend was informed that people were looking for her and that her picture was on Facebook.  Defendant went to the police that same day.  Defendant took responsibility for firing the bullet that hit Mikelia Busch but stated that it was not her intention to do so.  Defendant stated that when she cocked or "racked" her firearm, it "popped back."  Specifically, "When I pulled it back, I'm guessing it was, it might, it might have been pointed down but, like I [said], when it went off, it popped back.  I just felt like it did like a jerk to my, to my hand" and "it burnt the side of my finger."  Defendant ultimately testified that the shooting "was an accident."

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, we review all appeals for errors patent on the face of the record.  After reviewing the record, we find no errors patent.

36

**ASSIGNMENT OF ERROR:**

In her sole assignment of error, Defendant contends that the evidence presented at trial, when viewed in the light most favorable to the prosecution, was insufficient to convict her of second degree murder beyond a reasonable doubt. More specifically, Defendant argues that the State failed to prove beyond a reasonable doubt that she had the specific intent to shoot the victim, Mikelia Busch. Defendant characterizes the shooting as accidental and does not claim self-defense.

***Standard of Review***

The analysis for insufficient evidence claims is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Additionally, the testimony of a single witness, if believed, and absent internal contradictions or irreconcilable conflicts with physical evidence, is sufficient to support a conviction. *State v. Pierre*, 14-1071 (La.App. 3 Cir. 5/6/15), 170 So.3d 348, *writ denied,* 15-1151 (La. 5/13/16), 191 So.3d 1054.

37

## Second Degree Murder

Defendant was convicted of the second degree murder of Mikelia Busch. Louisiana Revised Statutes 14:30.1 defines second degree murder as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm." Specific intent is the "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1).

"Specific intent may be formed in an instant." *State v. Veillon*, 19-606, p. 9 (La.App. 5 Cir. 7/29/20), 297 So.3d 1091, 1100, *writ denied*, 20-1297 (La. 2/9/21), 310 So.3d 178. "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Draughn*, 05-1825, pp. 7–8 (La. 1/17/07), 950 So.2d 583, 592–93, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007). "Specific intent to kill may also be inferred from a defendant's act of pointing a gun and firing at a person." *State v. Reed*, 14-1980, p. 21 (La. 9/7/16), 200 So.3d 291, 309, *reh'g granted in part on other grounds*, 14-1980 (La. 10/19/16), 213 So.3d 384, *cert. denied*, 580 U.S. 1166, 137 S.Ct. 787 (2017); *see also State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002); *State v. Williams*, 383 So.2d 369 (La.1980); and *State v. Procell*, 365 So.2d 484 (La.1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2164 (1979).

Lastly, "[t]he law does not require that the intent to kill be of a specific victim, but only that the defendant had the intent to kill someone." *State v. Dubroc*, 99-730, p. 6 (La.App. 3 Cir. 12/15/99), 755 So.2d 297, 303.

## Analysis:

Defendant argues that the State failed to present sufficient evidence to prove that she committed second degree murder beyond a reasonable doubt. According to

Defendant, the State presented no evidence to show that she "had the specific intent to kill or inflict great bodily harm on Mikelia Busch, a person she had never met before." To support her assertion, Defendant claims that "there was no contact wound" and that she was nowhere near Mikelia Busch when Busch got shot. Furthermore, no witnesses testified that they saw Defendant "point, aim, and shoot a gun at Mikelia Busch." At best, Defendant contends that she may be guilty of negligent homicide, as she made a "poor judgment call" on the night of the incident.[1] Ultimately, Defendant argues that the evidence presented at trial was insufficient to support a conviction for second degree murder.

On the contrary, the State argues that the evidence was sufficient to support Defendant's conviction. According to the State, the "direct, circumstantial and corroborating evidence" showed that Defendant had the "specific intent to kill or to inflict great bodily harm of Mikelia Busch." Additionally, the State contends that Defendant's specific intent to kill was proven when Defendant admitted to "brandishing the firearm, racking or cocking it, and firing the weapon." The State claims that the defense failed to dispute the evidence presented by the State through witnesses or physical evidence. Therefore, the State asserts it proved all the elements necessary to establish that Defendant committed second degree murder.

In *State v. Mitchell*, 99-3342 (La. 10/17/00), 772 So.2d 78, the supreme court reversed the first circuit court of appeal and reinstated a jury verdict finding the defendant guilty of attempted first-degree murder. The defendant and several others rode in a vehicle to witness a fight between rival groups in a parking lot. At the time

---

[1] "Negligent homicide" is defined as "[t]he killing of a human being by criminal negligence." La.R.S. 14:32(A)(1). "Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances." La.R.S. 14:12.

they were drinking and smoking marijuana. Another passenger in the car, Mr. Barrow, asked for the defendant's gun, saying he was going to shoot it if a fight broke out. The defendant requested the gun back if Mr. Barrow was not going to fire it. A fight broke out and the driver exited the parking lot. At that time, Mr. Barrow fired the gun at the crowd, striking two people. The driver of the vehicle sped away. The evidence presented indicated that, in addition to what Mr. Barrow said he was going to do with the gun, he had made that statement in order to take the gun away from the defendant, who was known to waive a gun around when he was intoxicated.

> The First Circuit examined assignment of error number six . . . relative to insufficiency of evidence, and reversed the decision of the jury, finding that the evidence, viewed in a light most favorable to the State, did "not establish beyond a reasonable doubt that defendant intended that Barrow use the gun to kill someone." *State v. Mitchell*, 99-0283 (La.App. 1 Cir. 11/5/99), 745 So.2d 208, 213. The court of appeal reasoned that because the evidence was entirely circumstantial, the State was required to negate every reasonable hypothesis of innocence according to LA.REV.STAT. § 15:438. The court of appeal concluded that the evidence did not exclude "the reasonable hypothesis of innocence that defendant gave the gun to Barrow with the intent that Barrow would fire the gun into the air." *Id*. The court of appeal also noted that it was significant that the defendant was not involved in the fight in the parking lot, had made no threats toward any of the people involved in the fight, and had no reason for wanting to shoot into the crowd. *Id*.

*Id*. at 81–2. One of the dissenting Justices notes that the other two occupants of the vehicle testified that Barrow's actions were "spontaneous and unilateral" while the "sole evidence of the defendant's specific criminal intent [was] Barrow's self-serving testimony that the defendant told him to give the gun back if he did not intend to shoot it." *Id*. at p. 87 (Johnson, dissenting). However, a majority of the supreme court disagreed, explaining the following:

The jury is the ultimate factfinder of "whether a defendant proved his condition and whether the state negated that defense." *Id*. The reviewing court "must not impinge on the jury's factfinding prerogative in a criminal case except to the extent necessary to guarantee constitutional due process." *Id*. (citing *State v. McKeever*, 407 So.2d 662, 665 (La.1981)). Therefore, in order for a reviewing court to reverse a conviction based on an alternative hypothesis of innocence, the court must find that the jury could not have negated a potential alternative hypothesis for the defendant's action because specific intent to kill was not proven. . . . Here, the State presented evidence of the defendant's specific intent to kill which the jury accepted. The reviewing court cannot assume a reasonable alternative hypothesis exists where the jury has heard evidence of specific intent to kill to negate the hypothesis.

"The actual trier of fact's *rational* credibility calls, evidence weighing, and inference drawing are preserved . . . by the admonition that the sufficiency inquiry does not require a court to ask itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt." *State v. Mussall*, 523 So.2d 1305, 1311 (La.1988). The reviewing court is not called upon to determine whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. *Id*. Rather, the court must assure that the jurors did not speculate where the evidence is such that reasonable jurors must have a reasonable doubt. *Id*. (*citing* 2 C. Wright, Federal Practice and Procedure, Criminal 2d, § 467, at 465-466 (1982)). The reviewing court cannot substitute its idea of what the verdict should be for that of the jury. *Id*. Finally, the "appellate court is constitutionally precluded from acting as a 'thirteenth juror' in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact." *State v. Azema*, 633 So.2d 723, 727 (La.App. 1 Cir.1993).

The defendant argues that he lacked the requisite specific intent to kill because it is a reasonable hypothesis that he handed the gun to Barrow in order for Barrow to fire a warning shot or to use the gun in self-defense if necessary. The court of appeal agreed with this contention and, applying the *Captville* test, determined that the jury failed to exclude every reasonable hypothesis of innocence. More particularly, the court of appeal concluded that it was a reasonable hypothesis that the defendant gave the gun to Barrow with the intent that Barrow fire the gun into the air. The court reasoned that even though the defendant requested the return of the gun if Barrow would

not shoot it, this circumstantial evidence was only enough to prove that the defendant may have wanted Barrow to shoot the gun, not to kill someone.

In reaching the conclusion that the jury should have had a reasonable doubt concerning the defendant's specific intent to kill, we find that the court of appeal impermissibly substituted its judgment for that of the jury.

*Id*. at 82–3.

Defendant asserts that the shooting was an accident, that she cocked the gun and when she did so, the gun went off. However, the evidence presented, including Defendant's own testimony, was sufficient to rule out Defendant's theory that the gun accidentally discharged.

The State provided Dr. Tape's testimony that, while a gun can misfire, there is no "accidental shooting" and that if a person asserts that a shooting was an accident, they must "prove that [the] gun can fire on its own." No evidence to that effect was presented by Defendant. The State also reiterated that Defendant admitted to deliberately pulling out and racking her firearm in response to Thomas hitting her upon her head. Testimony was also presented that after shooting the victim, Defendant pointed her weapon at Shuntavica Busch, and that she was waving the gun around, talking with her hands.

Furthermore, the jury instructions included charges on specific intent, part of which was the following: "Intent is a question of fact which may be concluded from the circumstances. . . . Specific intent to kill can be inferred from the circumstances. . . . The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact, that is, defendant acted with specific intent to kill."

Most importantly, Defendant's own testimony that she meant to shoot in the air indicates her intent to fire the weapon. Defendant denied pointing the weapon at anyone and denied pulling the trigger, yet Defendant stated she meant to fire into the air. Defendant also claimed she did not know there was a round in the chamber ready to fire. Further, Defendant testified she did not know what "cocking" does to a weapon. Despite these claims, Defendant immediately stated that she cocked the weapon in preparation for shooting it in the air, thus indicating that she knew cocking or racking prepares a firearm to shoot. Also, Defendant acknowledged having previous firearms training due to her work as a prison guard, although she attempted to downplay the sophistication of said training. Additionally, Defendant's statement that the fateful round "missed him" (Thomas) suggests she had the gun pointed in his direction. As a practical matter, the gun must have been leveled at an angle dangerous to humans, as her shot struck the victim in the head.

As noted in *Reed*, 200 So.3d at 309, Defendant's act of racking or cocking the gun, pointing it, and firing at Thomas demonstrated her specific intent to kill. Therefore, the doctrine of transferred intent applies.

> The doctrine of transferred intent provides that "[w]hen a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim actually intended to be shot, then it would be unlawful against the person actually shot, even though that person was not the intended victim." *State v. Strogen,* 35,871, p. 4 (La.App. 2 Cir. 4/3/02), 814 So.2d 725, 728 (citing *State v. Jasper,* 28,187, p. 18 (La.App. 2 Cir. 6/26/96), 677 So.2d 553, 566–67).

*State v. Ross*, 12-109, pp. 8–9 (La.App. 4 Cir. 4/17/13), 115 So.3d 616, 621 (alteration in original), *writ denied*, 13-1079 (La. 11/22/13), 126 So.3d 476.

*State v. Jerico*, 22-251, p. 21 (La.App. 3 Cir. 11/16/22) (unpublished opinion) (2022 WL 16955110).

Similarly, in *State v. Strogen*, 35, 871 (La.App. 2 Cir. 4/3/02), 814 So.2d 725, *writ denied*, 02-1513 (La. 12/13/02), 831 So.2d 983, the second circuit affirmed the defendant's second degree murder conviction, despite the defendant's allegations of insufficient evidence, finding Defendant intended on shooting one person, but missed and struck the victim. In *Strogen*, the defendant, the victim, and the victim's friend, Mr. Greene, were in a club parking lot following a football game at a local high school. The victim and Mr. Greene were near one another when the defendant pointed and shot a pistol, killing the victim. At trial, the defendant's cousin testified that the defendant admitted he was in an altercation with Mr. Greene while at the game, and that he saw the defendant shoot the gun. Another witness testified that the defendant admitted to "shooting in the air" and that they saw the defendant with the gun immediately after the incident. *Id*. at 727. However, Mr. Greene testified that he and the defendant were not in an altercation, and he could not identify the defendant at trial. The State argued the doctrine of transferred intent, that the defendant intended on shooting Mr. Greene, but instead struck and killed the victim. In affirming the conviction, the second circuit considered the evidence as follows:

> The evidence presented by the State at trial shows that Defendant admitted to getting into an altercation with Mr. Greene at the football game and that Defendant pointed the gun towards Mr. Greene; therefore, the jury could have reasonably inferred that Defendant had the specific intent to seriously injure or kill Mr. Greene. Although Mr. Patton was not the intended victim, but in close proximity to Mr. Greene, we find that the doctrine of transferred intent is applicable and that the requirement of specific intent has been met in this case.
>
> . . . .

44

While it is true that Mr. Greene testified that he did not have an altercation with Defendant prior to the shooting and could not identify Defendant at trial, this court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under *Jackson v. Virginia, supra,* and does not extend to credibility determinations made by the trier of fact. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. We conclude, based on Mr. Jeter's testimony concerning Defendant's admission to a prior altercation with Mr. Greene, that the jury could have reasonably found that the altercation occurred.

The jury could have reasonably inferred that Defendant intended to cause serious bodily injury or death upon Mr. Greene because the evidence revealed that he was angry with Mr. Green and pointed a pistol towards him. The jury could have also reasonably concluded that Defendant shot Mr. Patton, as the evidence revealed that he did shoot a pistol and was in possession of the same pistol that was used to shoot Mr. Patton immediately following the shooting.

*Id*. at 728–29 (citations omitted).

We observe that the State does not argue transferred intent on appeal, nor did it do so in closing arguments at the trial. The jury received a general instruction regarding specific intent. However, defense counsel's closing pointed to Markez Thomas's alleged role in the pertinent events, indicating that Defendant acted in response to him. Under the doctrine of transferred intent, Defendant's acknowledgement that she drew and racked her weapon in response to Thomas approaching would be sufficient for the jury to believe that she had the specific intent to shoot Markez Thomas. As in *Thomas* and *Strogen*, Defendant's specific intent to shoot Thomas can legally serve as the specific intent to shoot Mikelia Busch.

A jury may believe some, none, or all of the trial testimony. *State v. Perkins*, 11-955, p. 10 (La.App. 3 Cir. 3/7/12), 85 So.3d 810, 817. Thus, the jury could rationally have discounted much of Defendant's testimony. First, the jury clearly rejected Defendant's theory of an accidental discharge of the weapon. Second,

45

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find Defendant guilty of the second degree murder. While there was no direct evidence presented to suggest that Defendant had the specific intent to kill or cause great bodily harm to Mikelia Busch, there was evidence presented to suggest that Defendant had the specific intent to kill or cause great bodily harm to Markez Thomas. A rational trier of fact could conclude from the evidence presented that Defendant cocked the gun and pulled the trigger as Thomas approached her, the shot missing Thomas but ultimately striking both her cousin and the victim who were engaged in a physical fight. Even accepting Defendant's general characterization of the events surrounding the shooting, the jury could rationally conclude Defendant was guilty as charged. In addition to the transferred intent cases, firing into a group of people is indicative of specific intent to kill. *Perkins*, 85 So.3d 810, *see also*, *Dubroc*, 755 So.2d 297. It is apparent from the facts recited earlier that multiple people were in front of Defendant when she fired her weapon. Accordingly, we find that Defendant's assignment of error lacks merit.

**DECREE:**

For the reasons set forth above, Defendant's conviction and sentence is affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.

46